**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **3:20-CR-147** |
| **v.** | : | **(JUDGE MANNION)** |
| **JOHN L. KRAMER,** | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Pending before the court are defendant John Lewis Kramer's motion to suppress statements pursuant to Fed.R.Crim.P. 12(b), made to a detective after he was arrested, (Doc. 38), and his motion for separate trials on Counts 1 and 2, (Doc. 40), of the superseding indictment, (Doc. 29). Kramer is charged with sexual exploitation of children, in violation of 18 U.S.C. §2251(a), and attempted witness tampering, in violation of 18 U.S.C. §1512(b)(1). Kramer seeks the court to suppress his incriminating statements alleging that they were involuntary and that he was coerced into making them based on the conditions of his custody, his alleged medical conditions, and his alleged injury incurred during his arrest. Kramer contends that all of his statements should be suppressed under the 5th Amendment since he was in custody and being interrogated but he did not voluntarily make his statements due to the alleged coercion.

Kramer requested an evidentiary hearing, and the court granted his request since there were factual disputes at issue regarding the voluntariness of the statements Kramer made to the detective. (Doc. 42).

For the reasons discussed below, and after consideration of the testimony and evidence presented at the hearing, Kramer's suppression motion will be **DENIED IN ITS ENTIRETY**. Kramer's motion for separate trials on Counts 1 and 2 will also be **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Kramer moves to suppress all of the incriminating statements that he made during an interview on March 30, 2020, to a detective with the Scranton Police Department ("SPD") after his arrest.

As a backdrop, on March 29, 2020, at about 6:14 p.m., SPD officers received a call from Kramer's wife Terry stating that she found photos on her husband's cell phone showing that he was sexually assaulting their minor daughter, 14 years old, and that it was occurring for some time. (Doc. 43-1, Lackawanna County Department of Emergency Services Call Report). When officers arrived at Kramer's North Lincoln Avenue house in Scranton, PA, they interviewed his wife who stated that her daughter, when confronted, admitted Kramer had sexually abused her. Kramer's daughter was taken to the Child Advocacy Center to be interviewed and to examined.

SPD officers arrested Kramer at his house and Officer Michael Costanzo was contacted to transport Kramer about two miles to the SPD Headquarters in a police prisoner transport van, car 18. (Id.). Costanzo arrived at Kramer's house about 9:00 p.m. Kramer was handcuffed behind his back and then put into car 18. No restraints or seatbelts were placed on Kramer. The police vehicle in which Kramer was transported had video cameras with audio which recorded Kramer during the short ride. Costanzo had a monitor on which he could view Kramer during the ride. The video and audio recording in car 18 was operational at the relevant time.

When Kramer arrived at the SPD Headquarters, at 9:15 p.m., he was placed in holding cell 4, (Doc. 43-2), which was located in the same area as the other holding cells. Further, each holding cell had a cement bench attached to the cinder block walls, a metal toilet, and a metal sink. (Doc. 43-3).

On March 30, 2020, at about 12:12 a.m., SPD Detective Christian Gowarty, with the Special Investigation Unit, brought Kramer into an interview room and explained to Kramer that the interview was being video recorded. Kramer was then read his *Miranda* rights. Gowarty asked if Kramer had any questions and whether he still wanted to talk to him. Kramer responded that, "As it stands currently I'm just trying to figure out what's going on. I have no idea." Gowarty explained the allegations and some of the evidence and Kramer nodded his head indicating that he understood.

The interview lasted about 20 minutes. As detailed below, during the interview Kramer made several incriminating statements, including admissions that he had sex with his minor daughter over a period of time. As the interview was ending, Gowarty asked Kramer if he had any questions, and Kramer responded by asking "what type of situation" he was facing.

When the interview was over, Kramer was returned to cell 4.

On June 23, 2020, a grand jury returned a one count indictment charging Kramer with sexual exploitation of children, in violation of 18 U.S.C. §2251(a). (Doc. 1).

On July 8, 2020, Kramer had an initial appearance before Magistrate Judge Saporito, and he entered a not guilty plea and he was ordered to be detained in Lackawanna County Prison ("LCP"). (Docs. 14 & 15).

On March 16, 2021, the grand jury returned a superseding indictment again charging Kramer with sexual exploitation of children and an additional count of attempted witness tampering, in violation of 18 U.S.C. §1512(b)(1). (Doc. 29). The new charged was based on a letter Kramer allegedly wrote to his wife. (*See* Doc. 41-1).

On March 22, 2021, Kramer had an initial appearance before Magistrate Judge Mehalchick with respect to the superseding indictment and he entered a not guilty plea. His detention in LCP was continued. (Doc. 35).

On March 29, 2021, Kramer filed, through his appointed counsel, his motion to suppress and supporting brief alleging that his statements to SPD

4

detective on March 30, 2020 were involuntary and coerced by the harsh conditions and by his alleged medical conditions, including a head injury and back pain. (Docs. 38 & 39). Also on March 29, 2021, Kramer filed a motion to sever Counts 1 and 2 of the superseding indictment for trial pursuant to Fed.R.Crim.P. 8 and 14, and a brief in support. (Docs. 40 & 41).

On April 7, 2021, the government filed its brief in opposition to Kramer's motion to suppress statements with attached Exhibits, A-E. (Docs. 43 & 44). Exhibits B & E are the video recording of Kramer's ride to SPD Headquarters and the recorded interview of Kramer, both of which are contained on a disc. On April 8, 2021, the government filed its brief in opposition to Kramer's motion to sever his trial. (Doc. 45).

The court conducted an evidentiary suppression hearing on April 14, 2021, and heard the testimony of Officer Costanzo, Detective Gowarty, and from defendant Kramer. The video evidence was also admitted and viewed by the court.

## II.    LEGAL STANDARD FOR SUPPRESSION MOTION

In U.S. v. Sater, 477 F.Supp.3d 372, 379 (M.D. Pa. 2020), the court discussed a defendant's 5th Amendment rights in the context of a suppression motion and stated:

> The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness

against himself." U.S. Const. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966)). To ensure a person's Fifth Amendment rights are protected, *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

Here, Kramer argues that his post-*Miranda* statements to Gowarty were involuntary and coerced, and that they should all be suppressed.

In U.S. v. Whiteford, 676 F.3d 348, 362 (3d Cir. 2012), the Third Circuit explained:

> The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 2262 (2010). A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986).

In United States v. Hodge, 2017 WL 1345219, *13 (D.V.I. Feb. 24, 2017), the court discussed a waiver of rights and stated:

> To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." Briscoe, 69 F. Supp. 2d at 741 (quoting United States v. Tyler, 164 F.3d 150, 158 (3d Cir. 1998)) (quotations omitted).

6

Courts also must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id.* (citing <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1046 (1983)) (internal citations omitted). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, the defendant's physical and mental state, and other pressures affecting the defendant's powers of resistance and self-control. *Id.* at 741 n.1. "*Miranda* rights will be deemed waived only where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." <u>United States v. Sriyuth</u>, 98 F.3d 739, 749 (3d Cir. 1996) (quoting <u>Alston v. Redman</u>, 34 F.3d 1237, 1253 (3d Cir. 1994)).

## III.    DISCUSSION

### A. Motion to Suppress Statements

This court has jurisdiction over Kramer's motion to suppress under 18 U.S.C. §3231.

The government has the burden of proving, by a preponderance of the evidence, that Kramer's statements made during his interview were voluntary. *See* <u>Sater</u>, 477 F.Supp. 3d at 383. If the government fails to meet its burden, the defendant's involuntary statements are not admissible in evidence for any purpose. "Due process requires a suspect's confession to be voluntary if it is to be admitted into evidence", and "[a] confession is involuntary if the suspect's will was overborne in such a way as to render his confession the product of coercion." *Id.* at 384 (internal citations omitted). Additionally, "[i]t is well established that an involuntary confession may result from psychological, as well as physical, coercion", *Miller v. Fenton*, 796 F.2d

598, 603 (3d Cir. 1986), and "[t]he question in each case is whether the defendant's will was overborne when he confessed." *Id.* at 604. The court considers, in part, "the specific tactics utilized by the police in eliciting the admissions," and "the details of the interrogation" in determining whether the officer's statements and actions, as well as the conditions, were so coercive that they deprived he defendant of "his ability to make an unconstrained, autonomous decision to confess." *Miller*, 796 F.2d at 604.

Kramer moves to suppress his incriminating statements under the 5th Amendment with respect to his post-arrest interview at SPD Headquarters. No doubt that Kramer was in custody at the time in question and that he was read his *Miranda* rights by Gowarty prior to his interview. However, he argues that all of his alleged incriminating statements made during his interview should be suppressed because his *Miranda* waiver was not valid and, because his statements to Gowarty were involuntary and forced by coercion due to tortuous and intolerable conditions as well as his medical conditions, including an alleged head injury. Specifically, Kramer argues that the alleged conditions before his interview when his incriminating statements were made, which are detailed below and contained on the disc with the recorded interview, Doc. 44, Ex. E & Govt. Ex. 6, were intolerable, coercive and caused his will to be overborne rendering his statements involuntary.

After his arrest, Kramer was handcuffed behind his back then placed by Costanzo in a police transport vehicle, car 18, where he was seated on a

3-person bench without safety restraints. Costanzo did not put restraints on Kramer to avoid exposing his sidearm to Kramer if he reached across Kramer to put the seatbelt on him. Kramer alleges that the police vehicle was driven in a "rapid manner causing him to be jostled about and hitting his head against the wall of the vehicle." As a result, he claims to have "sustained a concussion", and then suffered a lingering headache.

The video recording, with audio, taken from the prisoner compartment in the police transport vehicle, which was played during the hearing, does not show Kramer hitting his head on the wall as he testified he did or being excessively jostled around during the 2-mile ride. Although the short ride lasting a few minutes was bumpy at times, Kramer endured only slight bouncing in the seat, as Costanzo maintained the speed limit of about 25 mph. The video does not show Kramer falling from the seat or that he was thrown about, and he does not appear to be in any pain or discomfort. Kramer did not make any noise or statements indicating that he was hurt. There was no sound of Kramer hitting his head against the van wall. Nor did Kramer complain to Costanzo or any officers after the ride that he injured his head or back and, he did not request medical treatment or complain about a headache. Further, Kramer did not offer any medical evidence to show that he sustained any head injury and there were no physical manifestations showing that he injured his head. As such, the court finds that Kramer did not hit his head during the brief ride to SPD Headquarters and further he did

not sustain any head injury. Kramer's testimony that he did hit his head is not credible, completely belied by the evidence and is not afforded any weight.

Next, Kramer alleges that during the hours he was confined in the holding cell prior to his interview, "he badly needed to urinate and defecate" but could not since the cell did not have a working toilet. Kramer then states that he was denied access to a functioning bathroom until after his interview. He also alleges that there were "bright buzzing fluorescent lights shining in the cell" and that this was harsh on him since he suffers from photosensitivity, and must avoid bright lights, and that his ailment causes migraine headaches due to exposure to light. He alleges that even though it was cold outside, the air conditioner was "blasting in his cell", and that it was "tortuously cold." Kramer alleges that he was made to endure these harsh conditions and this "unbearable environment", including freezing, inability to use the toilet, a possible concussion, and a migraine headache, "for over four hours."

Additionally, Kramer alleges that he has arthritis in his back as well as orthopedic (flat feet) and muscular ailments (i.e., muscle hematoma in his back) which were exacerbated by the "extreme cold" in his cell.

The testimony confirmed that upon exiting the transport van, Kramer walked unassisted and without any trouble into the SPD Headquarters, and he was steady on his feet. Costanzo then processed Kramer, took his jacket as a suicide precaution, removed his handcuffs, and placed him in holding cell 4 at 9:15 p.m. (Govt. Ex. 2). Kramer walked into the cell without

assistance. The cell had three cinder block walls with a metal sink and toilet along with a cement bench. (Govt. Exs. 3-5). Although Kramer stated that the toilet did not work and that he could not use it despite having to go to the bathroom, he admitted that he urinated in the toilet but claimed that it would not flush. On the other hand, Officer Costanzo testified that the toilet was working during the time Kramer was confined in cell 4, and that he did not observe any malfunction with the toilet when he arrived for his shift that evening after he inspected the holding cells at the beginning of his shift and checked the functions in the cell. He also stated that if the toilet was not working, the cell would have been taken out of service. Costanzo did agree with Kramer that there was no toilet paper in the holding cell but explained that due to past problems with detainees, such as intentionally blocking the toilets, it was not kept in the cells but that it is provided when a prisoner asks for it. Further, prior to his interview, the credible testimony reveals that Kramer did not complain to any officer that the toilet was not working and he did not ask for toilet paper.

Kramer also testified that the air conditioning was running in cell 4 when he was confined there for about three hours before his interview and that the cold was exacerbating his alleged arthritis, fibromyalgia, and back impairment. Kramer also stated that he was shivering and had a headache, and that the florescent light in the cell was aggravating his photosensitivity to lights. Costanzo however stated that the holding cell temperature was about

11

65 to 68 degrees Fahrenheit, and that it was the same temperature in the entire Police Headquarters. Costanzo stated that it was not cold in the Headquarters the night in question. No thermostats are in the holding cells to separately control their temperatures and there was no evidence to corroborate Kramer's testimony that the air conditioner was running in his cell at any time.

Kramer then alleges that "[a]fter hours of suffering" in the holding cell, while he was "not fully oriented" and in "severe pain" due to the cold which exacerbated his conditions and his head injury, Gowarty arrived to take him to a room to be interviewed, allegedly saying, "I need to talk to you." Kramer testified that he told Gowarty that he needed toilet paper to go to the bathroom and that he had to defecate for over one hour before the interview, but he claims Gowarty said, "I have to talk to you first". Kramer contended that he was in discomfort, and that during the short walk to the interview room, which took about 30 seconds, Gowarty told him to answer the questions "correctly", "the way I want you to", which Kramer construed to mean "in the guilty sense." Kramer walked to the interview room without appearing to be in pain and without any problems, and he stated that the interview room was warmer than the cell and that the lights were not as bright. However, Gowarty indicated that the temperature in the holding cells was normal and not too cold and, that it was the same temperature as in the Headquarters. Gowarty also testified that Kramer did not complain about the

12

temperature in the cell, about having a headache, about the lights being too bright, about a broken toilet, and about having to go to defecate before the interview.

As indicated, the interview was audio and video recorded and it was played in its entirety during the hearing, Govt. Ex. 6. Gowarty explained to Kramer the situation he was facing and that his wife had found pictures of their daughter on his cell phone in sexual poses and called the police. The video shows that after Kramer was given his *Miranda* rights by Gowarty, Kramer freely spoke to Gowarty and he made several incriminating statements, including admissions that he repeatedly had sex with his minor daughter who was 14, for about one year. Since the graphic sexual acts Kramer admitted to performing with his daughter are stated by him on the video recording, which was seen by both parties during the hearing, the court will not repeat them herein. Suffice to say that even though Kramer shockingly stated that his daughter "instigated" the sexual acts with him and that they were for "sexual educational purposes", Kramer admitted to many disturbing sexual acts with his daughter that were extremely incriminating. Kramer also admitted that it was hard to stop having sex with his daughter and that he "tried [his] best" to stop.

Gowarty testified that Kramer was very cooperative during the interview, that he was not in any apparent pain, that he did not have any apparent head injury, that he fully understood what was happening, and that

he was well spoken. Also, Kramer did not complain about the lights at any time or indicate that he needed special transitional glasses or medical care. It was not until the interview had ended and Kramer stood up did he say that the cell was really cold and did he mention that there was no toilet paper in the cell. The video recording supports Gowarty's testimony. In fact, Kramer admitted that he did not tell Gowarty that he was in pain.

Kramer basically testified that he only made the graphic and detailed admissions about having an ongoing sexual relationship with his minor daughter, which he stated were not true, since he believed that if he did not answer Gowarty's questions "correctly" and tell Gowarty what he wanted to hear to appease him, the unbearable conditions would continue and he would be forced to suffer longer in "major discomfort" and "severe pain", and he would not be given toilet paper and heat. As such, Kramer essentially stated that he was forced to confess to heinous crimes about sexual assaults and abuse of his 14 year old daughter since his will was overborne due to the tortious conditions and his "massive headache" which would not end unless he answered the questions as instructed by Gowarty. In particular, Kramer contends that "his will was overborn by being held in such an environment and under such conditions for hours prior to making a statement", and that "[h]e believed that unless he told the investigators what they wanted to hear he would continue to be made to suffer." Thus, he

contends that since his statement "was not voluntary and willingly made, but rather the product of coercion, it should be suppressed."

Kramer testified that it was not until his interview ended that he was given access to an operable toilet along with toilet paper, that the air conditioning was turned off, and that he was placed in "more comfortable conditions", including heat, which he attributed to saying what Gowarty wanted him to say.

There is no dispute that prior to his interview Kramer was in custody and that he was advised of his *Miranda* rights, including that he had the right to counsel before both the interview began but he could waive that right as well as his other *Miranda* rights.

After hearing the testimony of the witnesses and reviewing the evidence, the court finds that Kramer's *Miranda* waiver, prior to making incriminating statements, was voluntary, was knowingly made, and was the result of his deliberate choice. The court also finds that Gowarty accurately reported the incriminating statements Kramer made during his interview and that Kramer's testimony about his will being overborne by the alleged inhumane conditions was incredulous and not supported by any other evidence.

Moreover, the testimony of Gowarty, which is fully supported by the evidence, is much more credible than Kramer's unsubstantiated testimony and, the court finds that Kramer was not held in harsh intolerable conditions

as he alleges, and that he was not essentially coerced into making his statements in order to receive proper treatment. "[I]t is well-settled that, at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" U.S. v. Wadley, 2007 WL 4593508, *2 (W.D. Pa. Dec. 28, 2007) (citing U.S. v. Richardson, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007).

In fact, no corroborating evidence was offered to support Kramer's allegations regarding his head injury, his back pain, the inoperable toilet, and the cold temperature in his cell. Although Kramer did have a prescription to wear sunglasses in school in 2001 due to his light sensitivity, *see* D Ex. 1, and he was treated for his medical conditions, there is simply nothing in the record, including the video recording of the interview, that shows Kramer was in any pain or discomfort when he gave his statement, beside Kramer's testimony. Further, the interview video does not show that Kramer was disoriented in any manner, or that he was cold, and there is no indication that the light was bothering him.

In particular, as the government points out, (Doc. 43 at 4-5), in its opposition brief:

> Throughout the interview, Kramer, who is not in handcuffs, appears to be fully oriented and sitting comfortably with his arms on the table. The lighting appears to be normal and not only does Kramer fail to mention

any discomfort from the lighting, he also never appears to be squinting or having trouble seeing. Kramer is wearing a t-shirt and does not appear to be shivering or having any physical reaction throughout the interview consistent with the allegation that he was "tortuously cold". (Doc. 39 at 2). Kramer appropriately and coherently answers Detective Gowarty's questions throughout the brief interview and even articulates accurate descriptions of items, including a wooden lock box containing contraceptives and a blindfold.

The evidence also showed that his holding cell temperature was the same as the roll call room in the Headquarters and the supervisors' offices. Although Kramer stated that "it's really cold in [the holding cell]" after the interview, the court finds that he did not complain about the temperature before this time. In fact, the temperature in the holding cell area is kept at the same temperature as the roll call room and as the Captain's Office and the Lieutenant's Office. Further, the court finds that Kramer only asked for toilet paper after his interview and he was given some, and that he did not complain that the cell toilet did not work. In fact, the evidence shows that the toilet in cell 4 was working during the time Kramer was confined in it. Nor does the evidence show that Kramer was given more comfortable conditions, seemingly as a reward for answering "correctly" after his interview, since he was placed in the exact same holding cell. In fact, the court finds that Kramer's testimony to the contrary was not credible at all, especially since it was contradicted by all of the other evidence in the record.

Kramer, presently age 36, is obviously an intelligent adult person who can understand his rights, and he can read, speak and write English. Kramer

graduated from Northwestern Lehigh High School, and he served in the Army for approximately three years before receiving an honorable medical discharge due to having flat feet, and he was employed. As discussed, prior to the start of the interview, Gowarty explained Kramer's *Miranda* rights and asked if he had any questions. The interview then lasted less than 20 minutes. As such, Kramer's age and "his level of education would have enabled him to … comprehend [*Miranda* rights] and [their] meaning." Whiteford, 676 F.3d at 362.

Additionally, even though Kramer did not yet have counsel in this case, there is no evidence that he requested to consult with an attorney before his interview with Gowarty at SPD Headquarters. *See id.* (defendant must make "an objectively identifiable request for counsel" to invoke his Fifth Amendment rights.) (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994)). In fact, Gowarty testified that during the interview with Kramer, he did not request an attorney at any time and he did not invoke his right to remain silent. Kramer also admitted this during his testimony. The interview video recorded on disc, Govt. Exhibit 6, also substantiates these facts.

Based on the totality of circumstances regarding Kramer's *Mirandized* statements given on March 30, 2020 at SPD Headquarters, the court finds that the government has met its burden of establishing Kramer's waiver was valid since it was voluntary and the result of his free and deliberate choice

and not the result of threats or coercion or promises. Kramer was fully advised of the rights he was waiving and the consequences of his decision to waive them. Kramer then verbally acknowledged his rights. Kramer then voluntarily responded to Gowarty's questions and made several incriminating statements.

Also, there is no credible evidence that Kramer was coerced by any SPD officers or that he was subjected to the alleged inhumane conditions prior to his interview in order to cajole him into making his statements and answering questions how the detective wanted him to answer. As such, the court finds that Kramer's post-*Miranda* admissions were not coerced and will not be suppressed for trial. Kramer's motion to suppress will be denied in its entirety.

**B. Motion to Sever Trial**

Kramer also moves to sever Counts 1 and 2 pursuant to Fed.R.Crim.P. 8 and 14, (Doc. 41), arguing that the charges are improperly joined and that he will suffer undue prejudice if the charges are not severed for trial.

The purposes of Rules 8 and 14 are "to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Bruton v. United States, 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620 (1968). Federal Rule of Criminal Procedure 8 addresses the joinder of offenses and provides:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged-whether felonies or misdemeanors or both-are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Thus, there is not a misjoinder under Rule 8 if "the temporal proximity of and substantive similarities between the [two sets of charges] render them sufficiently related as to have the 'transactional nexus' required for joinder." U.S. v. Adens, 2015 WL 894205, *3 (E.D. Pa. Feb. 27, 2015); *see also* United States v. Jones, 2016 WL 3067010, *26 (W.D. Pa. June 1, 2017) ("Rule 8 authorizes joinder of charges if they are of a similar character, are based on the same act or transaction, or are part of a common scheme."). To determine whether there is a logical relationship between charges, trial judges may look at pre-trial documents, including but not limited to the indictment. *See* United States v. McGill, 964 F.2d 222, 242 (3d Cir. 1992).

However, [i]f joinder is improper under Rule 8, "the Court must order separate trials." Adens, 2015 WL 894205, at *2 (citing United States v. Walker, 657 F.3d 160, 170 (3d Cir. 2011)). Even if charges are properly joined under Rule 8, "the Court may sever [] offenses under Rule 14 '[i]f it appears that [the] defendant or the government is prejudiced by a joinder of offenses [] in an indictment or information or by such joinder for trial together.'" *Id*. (citing Fed.R.Crim.P. 14).

The burden is on the defendant of establishing improper joinder and there is a "heavy" burden on the defendant to show "clear and substantial prejudice resulting in a manifestly unfair trial." *Id*. (quoting United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991)); *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005) (A defendant seeking a severance has a "heavy burden and must demonstrate not only abuse of discretion in denying severance, but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial."). Additionally, "[e]ven when the risk of prejudice is high, less drastic measures than severance (such as limiting instructions) 'often will suffice to cure any risk of prejudice.'" *Id*. (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933 (1993) ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."). As such, "the appropriate question for the Court on a motion under Rule 14 is whether the jury can 'reasonably be expected to compartmentalize the evidence as it relates to the separate [charges] in view of its volume and limited admissibility.'" *Id*. (quoting United States v. Serubo, 460 F.Supp. 689, 694 (E.D. Pa. 1978)); *see also* Jones, 2016 WL 3067010, *26 ("Rule 14 provides the court discretion to order separate trials of counts, …, or provide any other relief that justice requires, if joinder of offenses appears to prejudice either the defendant or the government.") (citations omitted).

Here, Kramer argues that the superseding indictment contains two very separate and distinct charges. Specifically, Kramer states, (Doc. 41 at 2-3):

> In Count One, [he] is alleged to have taken visual depictions of himself having sexual contact with a minor. Discovery provided by the Government indicates that the photographs at issue were brought to the attention of the Scranton Police by Mr. Kramer's wife. Mrs. Kramer was alleged to have found the images while going through Mr. Kramer's phone and forwarded them to the Scranton Police. Mrs. Kramer is further alleged to have showed the images to the minor allegedly depicted therein, who purportedly indicated that the images were produced by Mr. Kramer. Mr. Kramer was subsequently arrested and detained on state charges in Lackawanna Country and later indicted federally and charged with the production of child pornography. Some 10 months later, while incarcerated at the Lackawanna County Prison, he allegedly authored a letter to his estranged wife containing statements that are construed as threatening and form the basis of Count Two of the Superseding Indictment. [*See* Doc. 41-1].

Kramer argues that the two charges stem from separate incidents that are not based on the same act or transaction, and that each incident involves differing types of conduct occurring ten months apart. He also contends that each incident will involve proof of an entirely different set of facts at trial and involve different elements, and that there is no evidentiary overlap between the two charges.

The government opposes Kramer's motion to sever the charges and explains the relationship between the two charges, (Doc. 45 at 3), as follows:

Following Kramer's federal indictment, Kramer wrote a letter to his wife, Terry Kramer, the initial complainant. [] Kramer sent the letter to his mother, Tammy McClure, in a sealed envelope with Terry's name on it. On January 23, 2021, McClure emailed Terry and let her know she had a letter from Kramer for her if she wanted it. Tammy responded to McClure's email and indicated she would pick up the letter on January 25, 2021. Kramer directed McClure to get a statement from Terry as to when she picked up the letter. McClure followed Kramer's instructions and directed Terry to provide her with a written confirmation that she received the letter. On January 25, 2021, Terry picked up the letter from McClure and then sent an email to McClure confirming receipt. Kramer also instructed McClure to ask Terry which option [in the letter] she chose, option one or option two. McClure contacts Terry and Terry informs McClure that she chooses neither option. Terry then contacts law enforcement regarding the letter.

Since Kramer submitted the letter he allegedly wrote to his wife as an Exhibit, (Doc. 41-1), the court does not repeat its content. Suffice to say that the letter specifically references Kramer's criminal case and the fact that his wife Terry called the police to commence the investigation which lead to his arrest. The letter also appears to threaten Terry with having her arrested and put in jail if she lets officials who are involved with her husband's case know about the letter or if she answers the letter "in any negative way." Based upon the court's review of the letter, it is clear that the witness intimidation charge against Kramer in Count 2 is intertwined and overlaps with the sexual exploitation charge against him in Count 1. In fact, the letter only makes sense when considering the facts of the underlying charges against Kramer

in Count 1. The 10-month gap between the two charges is of no moment since the letter explicitly relates to the initial charge filed against Kramer and Terry's role in starting the investigation. Thus, as the government states, (Doc. 45 at 10), "[t]he motive for the allegations in Count Two is based upon the charge in Count One of the superseding indictment", and "[t]he evidence on Count Two would encompass and substantially overlap much of the evidence presented for Count One." Thus, there is a clear and logical relationship between Counts 1 and 2, and the joinder of the charges in one trial promotes judicial economy and the efficient administration of justice.[1]

---

[1]Kramer notes in his brief, (Doc. 41 at 3 n. 1), that he will object at trial to the admissibility of the letter based upon spousal privilege. Kramer cites to FRE 402, 403 and 404. However, admissibility of the letter at trial falls under Fed.R.Evid. §501, which governs the applicability of privileges in the federal court. The government responds to Kramer's objection by stating that the letter is admissible "based upon the long-recognized exception to the spousal communication privilege which is triggered when one spouse commits an offense against another spouse." (Doc. 45 at 9 n. 1) (citing Trammel v. United States, 445 U.S. 40 (1980)). The government also states that it will "argue admissibility based upon the expansion of the 'offense against spouse' exception which includes an offense against a child of either spouse." (Id.) (citing, in part, United States v. Breton, 740 F.3d 1, 10 (1st Cir. 2014) (holding that "courts have long recognized an exception to the [spousal testimony] privilege when one spouse commits an offense against the other, thereby harming the marital relationship and thwarting the privilege's purpose.")).

The court will admit the letter as evidence at trial based on an exception to the spousal communication privilege since it may be construed by the jury as witness intimidation by Kramer against his wife, and based on the "offense

24

Next, the court must consider if Kramer has demonstrated that "clear and substantial prejudice" will result if Counts 1 and 2 of the superseding indictment are tried together. "To establish a violation of Rule 14, a defendant must show that the 'denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial.'" U.S. v. Staton, 605 Fed.Appx. 110, 114 (3d Cir. 2015) (citation omitted). "A court should therefore grant a severance 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Id. (citing Zafiro v. United States, 506 U.S. 534, 539–40, 113 S.Ct. 933 (1993)). Further, mere speculation and generalized allegations of prejudice by the defendant are insufficient. Id.

---

against spouse" exception. See Breton, 740 F.3d at 12 (First Circuit "agree[d] with [its] sister circuits and the vast majority of states that the 'offense against spouse' exception to the marital communications privilege must be read to cover an offense against a child of either spouse in order to further the privilege's underlying goals of promoting marital and family harmony.").

Also, under the privilege against adverse spousal testimony, Terry Kramer, the witness-spouse, can voluntarily testify against Kramer, the defendant-spouse, in a criminal proceeding, and this includes testimonial evidence (such as the letter) that is adverse to the defendant-spouse "[b]ecause the privilege rests with the witness-spouse, [and] that spouse alone has the power to waive the privilege, with or without the consent of the defendant-spouse." U.S. v. Tartaglione, 228 F.Supp.3d 402, 408 (E.D. Pa. 2017).

The letter at issue is clearly linked to the charge filed against Kramer in Count 1 which was initiated by his wife Terry when she discovered the images of their minor daughter on his cell phone and called SPD. The context of the letter references the initial charge against Kramer and the alleged threats in the letter directly pertain to the charge in Count 1 which Terry brought to the police's attention.

The court finds that Kramer has failed to satisfy his "heavy burden" to show that he is entitled to separate trials on Counts 1 and 2. He has also failed to show "clear and substantial prejudice" from the joinder of both Counts for trial. Kramer has only shown that if Count 2 is severed from Count 1, it may increase his chance of acquittal on Count 2 and this is not sufficient for a severance.

Moreover, Kramer has not made a showing that the jury will not be able to compartmentalize any evidence against him regarding the charge in Count 1 and the charge in Count 2. *See* Staton, 605 Fed.Appx. at 115. Further, there is only a two-count superseding indictment and this is not an overly complex case and, the evidence against Kramer appears to be "relatively straight-forward", *id.*, and the jury should be able to compartmentalize it without difficulty. Additionally, the court will instruct the

26

jury to "separately consider the evidence against the defendant on each of the offenses charged" and, it will tell the jury that its "decision on one offense ... should not influence [its] decision on the other offense." *Id*.[2] As the Third Circuit stated, *id.*, "[j]urors are presumed to follow their instructions." (citation omitted). Thus, the court will deny Kramer's motion to sever for trial Counts 1 and 2 of the superseding indictment. (Doc. 40).

## IV.    CONCLUSION

Based on the foregoing, the court finds that Kramer's statements to the SPD officers during his March 30, 2020 interview were made after he was given *Miranda* rights, after he knowingly and intelligently waived those rights, and, that he was not coerced to make the statements based on the totality

---

[2]Specifically, the court will charge the jury as follows:

The number of offenses charged is not evidence of guilt, and this should not influence your decision in any way. Also, in our system of justice, guilt or innocence is personal and individual. You must separately consider the evidence against the defendant on each offense charged, and you must return a separate verdict for the defendant for each offense. For each offense charged against the defendant, you must decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of that particular offense.

Your decision on any one offense, whether guilty or not guilty, should not influence your decision on any other offenses against the defendant. Each offense against the defendant should be considered separately.

of the circumstances in which he made them. Thus, Kramer's motion to suppress his statements, **(Doc. 38)**, will be **DENIED IN ITS ENTIRETY**.

Additionally, Kramer's motion to sever Counts 1 and 2 of the superseding indictment for trial, **(Doc. 40)**, will also be **DENIED** since both charges are clearly related and his alleged threatening letter to his wife was made regarding the child exploitation charge, and since there is no undue prejudice to the defendant. An appropriate order will be issued.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: April 16, 2021**

20-147-01

28